**Reverse in part; and Affirmed and Opinion Filed February 17, 2017**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00102-CV

**TEXAS CAPITAL BANK, AS SUCCESSOR INDEPENDENT EXECUTOR OF THE ESTATE OF FREDERIC B. "TEX" ASCHE, JR.; MARY SUSAN BARNHILL, AS INDEPENDENT EXECUTRIX OF THE ESTATE OF SARAH P. "SALLIE" ASCHE; AND BAYLOR UNIVERSITY MEDICAL CENTER, Appellants**
**V.**

**FRITZ ASCHE, VALE ASCHE ELKINS, CRAIG ASCHE, LISA MITTNACHT, AND RICK ASCHE, Appellees**

**On Appeal from the Probate Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. PR-11-3533-2**

## MEMORANDUM OPINION

Before Justices Bridges, Francis, and Whitehill
Opinion by Justice Whitehill

This will contest concerns whether a forensic psychiatrist's testimony that a stroke rendered the testator incapable of exercising testamentary capacity and consistent testimony from lay witnesses support the trial court's judgment setting aside multiple estate planning documents executed over a more than ten–year time period following that stroke.

In a will contest brought by Tex's children, a jury found that (i) Frederic B. (Tex) Asche lacked capacity to execute a series of wills, codicils, and trust documents after he suffered a serious stroke and (ii) his wife, Sarah P. (Sallie) Asche exerted undue influence over him regarding those documents. The trial court entered judgment accordingly.

Appellants Texas Capital Bank, as the successor independent executor of Tex's estate, Mary Susan Barnhill, as the independent executrix of Sallie's estate, and Baylor University Medical Center as the residuary beneficiary of Sallie's estate (collectively, appellants), contend that the evidence is legally and factually insufficient to support the verdict and the trial court's judgment in favor of Tex's children. Specifically, they argue that:

(i) The evidence is legally and factually insufficient to support the jury's finding that Tex lacked the required capacity when he executed a will and management trust in 2005, a will and related documents in January 1998, and a will and related documents in June 1998, or that he signed any of these documents as a result of undue influence;

(ii) The trial court erroneously admitted Dr. Lisa Clayton's expert testimony;

(iii) The trial court erred in excluding evidence that Sallie left her estate to Baylor specifically "for the purpose of providing financial assistance to those persons who need a bone marrow or other blood related transplant and who cannot otherwise pay for such transplant" instead of for charitable purposes generally;

(iv) A new trial is required because of juror misconduct; and

(v) The trial court lacked jurisdiction to set aside the management trust documents because the trustee was not a party to the suit.

As discussed below, we conclude that:

(i) The record evidence is legally and factually sufficient to support the jury's finding that Tex lacked capacity to execute the 1998 will and all subsequent estate planning documents (and we thus need not reach the undue influence question);

(ii) Dr. Clayton's testimony was not erroneously admitted;

(iii) The trial court did not abuse its discretion by excluding evidence of Sallie's specific bequest requirement;

(iv) The trial court did not abuse its discretion by denying appellants' motion for new trial based on jury misconduct; and

(v) The trial court lacked jurisdiction over the management trust because the trustee of that trust was not joined in the suit.

We therefore reverse the trial court's judgment setting aside the 2005 management trust and affirm the remainder of the trial court's judgment.

## I. Background

There was evidence admitted at trial of the following:[1]

**Before The Stroke**

Tex was a beneficiary of several family trusts, some of which had existed for generations. He was very proud of the Asche family name and his ancestors' financial legacy, and "in his right mind," Tex would never have wanted this money to leave the family.

Tex married Sallie in 1977. He had five children from previous marriages: Vale, Fritz, Craig, Lisa, and Rick (collectively, the Children).

Tex executed wills in 1994 and 1995.[2] The 1995 will left Tex's personal property and certain residences to Sallie, with the bulk of his estate going to the Children and Tex's grandchildren after Sallie's death.

---

[1] Lack of testamentary capacity and undue influence are separate and discrete concepts. *Rothermel v. Duncan*, 369 S.W.3d 917, 922 (Tex. 1963). The former questions whether the testator had the required testamentary capacity at the relevant points in time; whereas, the latter *implies* that the testator had that capacity but his or her ability to exercise that capacity as he or she would have otherwise desired was overcome by external factors. *See id*. ("Mental incapacity implies the lack of intelligent mental power; while undue influence implies within itself the existence of a mind of sufficient mental capacity to make a will, if not hindered by the dominant or overriding influence of another in such a way as to make the instrument speak the will of the person exercising undue influence, and not that of the testator."). Appellants, however, do not argue that the two findings conflict. We therefore do not address that question here. But evidence of one theory may also bear on the other. *See Estate of Lynch*, 350 S.W.3d 130, 134-35 (Tex. App.—San Antonio 2011, pet. denied) Moreover, appellants argue both their no evidence and factually insufficient evidence issues together. Therefore, we address all of the evidence without regard to which plaintiffs' theory applies.

[2] The signed copy of the 1995 will was never found. (3 RR 178-79).

Prior to the stroke, Tex was a flamboyant, dominating person. He "ran the show" and took care of Sallie. He had strong opinions and desires that he did not hesitate to articulate, and he handled the family business affairs and decisions.

**Tex's Stroke**

Tex suffered a severe stroke in September 1997. His right side was permanently paralyzed, and he could not walk, get his own food, bathe or dress himself, or get himself in and out of a chair. He communicated "on the level of a small child," and was unable to initiate conversations or engage beyond the most basic level. He was unable to make sense of the mail or understand his brokerage account statements. As Sallie noted, "[w]ith brain damage, there is a daily struggle to do the smallest of tasks . . . ."

**The Children's Interaction with Tex**

At least one of the Children or their spouses visited Tex in the hospital every day for almost three months. Several of the Children celebrated Christmas with him in 1997.

The children also visited frequently after Tex left the hospital. Vale and Ed visited often, and Fritz visited about three times a week. The Children that lived out of town wanted to visit, but Sallie told them it was not a good time. Neither Tex nor Sallie ever complained to the Children that they were not paying enough attention to him.

**The January 1998 Will**

In early January 1998, Sallie contacted Rust Reid, the estate planning lawyer who had prepared Tex's 1995 will. Sallie told him that Tex had suffered a stroke and they wanted to change their estate planning documents. Reid met with Tex and Sallie in their home the next day.

As a result of the meeting, Reid prepared and Tex signed a new will (the January 1998 will). The 1998 will disinherited the Children and left Tex's residual estate to Sallie.

–4–

In a memo memorializing the meeting and subsequent events (the Reid Memo), Reid noted that Tex's changed estate plan was motivated in part by the fact that the Children "had paid relatively little attention to [Tex] after the stroke." Reid also stated that the Children "have substantial property" and would receive even more upon Tex's death.

The Reid Memo reported that Tex took the lead in the discussions about his will and "made it clear that the matters discussed were the results of his decisions." Regarding the day of execution, the memo said:

> [Tex] was perfectly rational throughout our meeting and clearly understood that he was executing a new will and doing so of his own free will . . . In my opinion, [Tex] was competent. He was alert and all of his responses were appropriate. He gave no indication of being subject to any undue influence.

**Codicils to the January 1998 Will**

Sallie called Reid to request that he prepare codicils to the will, and Reid acknowledged that he did what she told him to do.

Tex executed two codicils to the January 1998 will; one in April 1998 and one in May 1998. The first codicil exercised a power of appointment to direct to Sallie all funds in one of the family trusts. The second codicil exercised a special power of appointment to direct the proceeds of another family trust to Tex's grandchildren,[3] and exercised a power of appointment directing to Sallie during her lifetime the income of several trusts created for the Children's benefit.

Four days after the executing of the second codicil, Sallie met with new attorneys, Don Godwin and Jim Vetter, to discuss preparing new estate planning documents for Tex. In a follow up letter addressed only to Sallie, Godwin wrote:

---

[3] Tex's power of appointment was limited to descendants under this trust, and thus the proceeds could not be directed to Sallie.

Thank you very much for coming in today to visit with Jim Vetter and me. We are having the estate planning documents picked up this afternoon from Rust Reid and will review them and get back to you within the next few days regarding our recommendations . . . .

**The June 1998 Will**

Vetter subsequently prepared a new will for Tex (the June 1998 will), which made no provision for the Children. Specifically, it stated: "I make no provision in this will for said children other than a contingent interest in my personal property since adequate provisions have been made for each of them by my ancestors. Thus, the focus of this will is to provide for my said wife."

Godwin admitted that they relied on Sallie to explain the will to Tex. And Godwin never told Tex that the will removed the Children from the ancestral trusts.

The will execution ceremony was videotaped and played for the jury. Godwin asked Tex whether the decision to not leave his estate to the Children was his, and whether he was comfortable with that decision. He also asked whether Tex was satisfied that the Children had been adequately provided for by his ancestors. Tex answered "yes" to each question. After the will was signed, Godwin handed the will to Sallie, and said, "You want to take, flip through there also if you will and make sure we got everything as far as the signatures and the notary?"

**Codicils to the June 1998 Will**

In 2000, Tex executed a codicil to his June 1998 will and gave Sallie his interest in a ranch family partnership owned by the Asche family members. Tex signed additional codicils in 2003 (clarifying a power of appointment to one of the trusts), 2004 (exercising a power of appointment of certain trust income to Fritz and Vale), and two in 2005 (granting, under the trust known as the mineral trust, $500,000 per year to each of the Children and $1,000,000 to the grandchildren at age fifty and amending the general power of appointment under the will to

appoint the interests to Sallie directly). Sallie instructed Vetter to prepare the codicils. Tex did not see these documents until Vetter brought them to his house for signing.

**The 2005 Will and Management Trust and Amendments**

On the recommendations of Sallie and Tex's financial advisor, Sallie contacted attorney Tim Tehan to do estate planning for Tex. All but one of Tehan's calls were with Sallie. All but one of Tehan's letters regarding Tex's estate planning were addressed to both Tex and Sallie, and all emails were with Sallie. Tehan testified that he "operated through Sallie," and considered any instruction from Sallie to be an instruction from Tex.

As part of the estate planning, Tehan proposed a management trust, and Tex agreed.[4] Tehan also prepared a new will, which included the provisions from the five codicils to the June 8, 1998 will, and which left Tex's residuary estate to Sallie outright. Tex signed the 2005 will and management trust on October 10, 2005.

Tex also signed a declaration of guardian, appointing Sallie as guardian, and two of Sallie's friends, one of whom lived in Pennsylvania, as alternative guardians. The declaration expressly disqualified the Children from serving as guardians. Tex had never seen the will, management trust, or guardian documents before Tehan came to his house for the signing.

The management trust was amended in January 2006, April 2007, and September 2011.

**Codicils to the 2005 Will**

There were several codicils to the 2005 will. The first codicil and its amendment, executed in January 2006 and June 2007, contained an administrative change and clarification about appointing trust income to Fritz and Vale. The second codicil, executed in February 2010, removed the $500,000 bequest to the Children. The 2011 amendment to that codicil confirmed

---

[4] Tex used the management trust to hold property jointly owned with Sallie. After Tex's death, the trust would include his residual estate, which would go to Sallie if she survived him.

removal of the $500,000 bequest and also removed Vale as an income beneficiary under one of the trusts. Tehan received the instructions for all of these codicils from Sallie.

**Sallie's Management of Affairs**

After the stroke, Sallie ran the household and financial affairs. She contacted and communicated with all of the lawyers and accountants. She changed the financial advisor to one recommended by her friend, Barnhill. All emails and telephone calls went through Sallie, and she controlled the mail.

Sallie also attempted to control the trust officers handling the Asche family trusts. One trust officer, Richard Menkiewicz, testified that after Tex's stroke, 75% of his calls were with Sallie, and the other 25% were with Tex and Sallie. There were never any calls with Tex alone. Menkiewicz was concerned about Tex's memory, and if he had questions, Sallie would answer and tell Tex to say, "Yes." Tex deferred to Sallie on every question starting in 2007.

Some of the trusts limited the power of appointment to descendants, including the trust known as the mineral trust. Although she could not directly receive from the mineral trust, Sallie attempted to increase Tex's distributions from that trust. When the trustees requested documentation to support the distributions, Sallie threatened litigation and removal of the trustees and cursed at a trustee and her staff. At one point, she had an attorney prepare a letter requesting additional distributions for a family vacation and use of a private airplane.

Martie Herrick, one of the trustees, was concerned that (i) Sallie was pushing for distributions from the trust to increase Tex's estate so that she could get it and (ii) money was being directed away from the family and to Sallie. At one point, Sallie told Herrick, "I want our damn money."

John Gurun, the financial advisor, testified he assumed Tex understood their discussions and transactions because Tex would smile and nod. The day before Tex died, Sallie instructed

him to transfer into her checking account $150,000 from a trust account on which she was not a signatory, trustee, or beneficiary.

In 2007, Sallie purchased a $4,600,000 condo in her own name at the Plaza Hotel in New York, and kept it a secret from everyone in the family, including Tex. To do so, she forged Tex's name on the $3,700,000 wire transfer from his account and then transferred the condo to her own trust. Barnhill helped Sallie conceal the purchase by receiving all bills and tax statements at Barnhill's house.

**Probate After Tex's and Sallie's Death**

Tex's health deteriorated in 2011, and he died on October 6 of that year. Shortly thereafter, Tex's 2005 will and 2007 and 2011 codicils were admitted to probate.

Although the Children were concerned about the will's provisions, Sallie was very sick with leukemia, so they did not think it was an appropriate time to discuss it. They also assumed that upon Sallie's death, Tex's money would not go outside the family.

Sallie died in the spring of 2012, after which the Children learned that she left everything to Baylor.

Based on lack of testamentary capacity and undue influence, the Children contested all of Tex's post-stroke wills, codicils, trusts, and amendments, and they offered Tex's 1995 will for probate. Baylor (as a beneficiary under Sallie's will) and Barnhill (as the executor of Sallie's estate) intervened in the lawsuit.

**Trial and Judgment**

The jury found that all post-stroke wills, codicils, trusts, and amendments were executed without testamentary capacity and due to undue influence.

Following post-trial motions, the trial court rendered judgment setting aside the post-stroke wills, codicils, and 2005 management trust and amendments, and it admitted the 1995 will to probate.[5]  This appeal followed.

## II.  Analysis

**A.  First, Second, Third and Fourth Issues:  Is the evidence legally and factually sufficient to support the jury's finding that Tex lacked capacity to execute the wills and related documents?**

Appellants challenge the legal and factual sufficiency of the evidence to support the jury's findings that Tex lacked capacity to execute the 2005 will and management trust documents, and the June and January 1998 wills and codicils.  They further challenge the legal and factual sufficiency of the evidence to support the jury's finding that Sallie unduly influenced Tex to execute these instruments.

Although there is evidence that Tex's health declined in the last year and a half of his life, there is no argument or evidence that his testamentary capacity changed from 1998–2005.  We therefore begin by examining evidence concerning Tex's testamentary capacity in January 1998 when he signed that will.

### 1.  Standard of Review

In a legal sufficiency review, we consider the evidence in a light most favorable to the verdict, and indulge every inference that would support it.  *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005).  In so doing, we credit evidence favorable to the finding if a reasonable fact finder could, disregard contrary evidence unless a reasonable fact finder could not, and reverse the fact finder's determination only if the evidence presented would not enable a reasonable and fair-minded person to reach the judgment under review.  *Id.* at 802, 827.

---

[5] The jury found that the 1995 will did not meet the requirements for a valid Texas will, but the trial court granted a JNOV and admitted the will to probate.

We will sustain the legal sufficiency challenge if the record reveals: (i) the complete absence of evidence supporting the finding; (ii) the court is barred by rules of law or evidence from giving weight to the only evidence offered to support the finding; (iii) the evidence offered to prove the finding is no more than a mere scintilla; or (iv) the evidence conclusively establishes the opposite of the finding. *Id*. at 810-11. More than a scintilla of evidence exists when the evidence presented rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

Under a factual sufficiency review, we consider and weigh all of the evidence and will reverse only when the finding is so against the great weight and preponderance of the evidence as to make it clearly wrong and unjust. *City of Keller*, 168 S.W.3d at 826. "Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony," and "[i]t is the province of the jury to resolve conflicts in the evidence." *Id*. at 819–20. "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so," and we may not substitute our judgment for that of the jury's. *Id*. at 822.

### 2. Testamentary Capacity

To make a last will and testament, a testator must be of sound mind, which means he must have "testamentary capacity." TEX. ESTATES CODE § 251.001; *In re Estate of Trawick*, 170 S.W.3d 871, 876 (Tex. App.—Texarkana 2005, no pet.). A testator has testamentary capacity when he has sufficient mental ability to understand that he is making a will, the effect of making a will, and the general nature and extent of his property. *Long v. Long*, 196 S.W.3d 460, 464 (Tex. App.—Dallas 2006, no pet.); *Bracewell v. Bracewell*, 20 S.W.3d 14, 19 (Tex. App.—Houston [14th Dist.] 2000, no pet.). He must also know the natural objects of his bounty, the claims upon them, and have sufficient memory to collect in his mind the elements of the business

transacted and hold them long enough to form a reasonable judgment about them. *In re Estate of Blokes*, 104 S.W.3d 333, 336 (Tex. App.—Dallas 2003, no pet.).

In a will contest based on incapacity, the pivotal issue is whether the testator had testamentary capacity when the will was executed. *See Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968). But evidence of the testator's state of mind at other times can prove his state of mind on the day the will was executed provided the evidence demonstrates that a condition affecting his testamentary capacity was persistent and was likely present when the will was executed. *Id.*

Circumstantial evidence may be relevant to the capacity issue including: (i) the party's conduct; (ii) circumstances tending to produce a particular mental condition; and (iii) prior or subsequent existence of a mental condition from which a party's capacity or incapacity at the time in question may be inferred. *In re Estate of Robinson*, 140 S.W.3d 782, 793 (Tex. App.—Corpus Christi 2004, pet. denied).

"Incapacity to make a will . . . is a subtle thing, and must be established to a great extent, at least so far as lay witnesses are concerned, by circumstantial evidence." *In re Boultinghouse's Estate*, 267 S.W.2d 614, 619 (Tex. Civ. App.—El Paso 1954, writ dism'd).

### 3. Expert opinions must be reliable.

The Children's expert, Dr. Lisa Clayton, opined that Tex lacked testamentary capacity (and was susceptible to undue influence) from his 1997 stroke until he died.[6] Appellants assert that Clayton's testimony is unreliable and therefore legally no evidence because (i) Clayton failed to bridge the analytical gap between the underlying medical records and her opinions and (ii) the records are not a reliable foundation because they do not actually support her opinions. As a result, appellants fourth issue maintains that the trial court erred by not excluding her

---

[6] Generally, rulings on the admission of expert testimony are reviewed for an abuse of discretion. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). But a party may assert on appeal that unreliable scientific evidence of expert testimony is not only inadmissible, but that its unreliability makes it legally insufficient to support a verdict. *Whirlpool Chem. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009).

testimony, and their first through third issues urge that we afford her opinion no weight in our sufficiency reviews.[7]

Texas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. An expert may testify regarding scientific, technical, or other specialized matters if: (i) the expert is qualified and (ii) his or her opinion is relevant, reliable, and based on a reliable foundation. *Whirlpool Corp. v. Camancho*, 298 S.W.3d 631, 638 (Tex. 2009). Reliability is at issue here.

The trial court, as the expert testimony gatekeeper, has the threshold responsibility of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). An expert's opinion is not reliable if the foundational data is unreliable or if the expert draws conclusions from sound data based on flawed methodology. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997).

Some courts use a list of non-exclusive factors, known as the *Robinson* factors, to determine expert reliability. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).[8] Although considering the *Robinson* factors and the expert's experience is one way to determine expert testimony reliability, *see Gammill*, 972 S.W.2d at 724, some subjects do not lend themselves to scientific testing and methodology, *see Comacho*, 298 S.W.3d at 639 (citing *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007)). Thus, the criteria used to

---

[7] The trial court denied appellants' pre-trial motion to exclude Clayton's opinion.

[8] These factors include: (i) the extent to which the theory has been or can be tested, (ii) the extent to which the technique relies upon the expert's subjective interpretation, (iii) whether the theory has been subjected to peer review and/or publication, (iv) the technique's potential rate of error, (v) whether the theory or technique has been generally accepted as valid by the relevant scientific community, and (vi) the non-judicial uses that have been made of the theory or technique. *Id.*

evaluate the reliability of expert testimony depends on the nature of the evidence. *Mack Trucks Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006).

Many courts have characterized expert psychological or psychiatric testimony as a "soft science" and have declined to apply the *Robinson* factors. *See Taylor v. Tex. Dep't of Protective & Reg. Svcs.*, 160 S.W.3d 641, 650 (Tex. App.—Austin 2005, pet. denied). When determining the reliability of an expert's opinion in a soft science, courts consider whether (i) it is a legitimate field of expertise, (ii) the subject matter is within the scope of that field, and (iii) the expert's testimony properly relies on the principles involved in that field of study. *Id.*; *see also In the interest of A.J.L.*, 136 S.W.3d 293, 297–301 (Tex. App.—Fort Worth 2004, no pet.) (applying soft science factors); *In the interest of G.B.*, No. 07-01-0210-CV, 2003 WL 22327191, at *2 (Tex. App.—Amarillo Oct. 10, 2003, no pet.) (mem. op.) (same). This is frequently referred to as the "analytical gap test." *See Comacho,* 298 S.W.3d at 639.[9]

Thus, where experts rely on experience or training to reach their opinions rather than on a particular methodology, a reviewing court considers whether there is too great an analytical gap between the data and the opinion proffered for the opinion to be reliable. *Moreno v. Ingram*, 454 S.W.3d 186, 193 (Tex. App.—Dallas 2014, no pet.); *Camacho*, 298 S.W.3d at 642.

For example, the court in *In re Estate of Robinson*, 140 S.W.3d 782, 792 (Tex. App.—Corpus Christi 2004, pet. denied) described how testimony by a forensic psychologist meets the reliability standard:

> While [the psychiatrist's] analysis of the medical records in this case involves the application of scientific principals [sic] it is not pure science. The methodology is not easily tested by objective criteria, such as identifiable scientific formulas. [Citation omitted]. Because [his] opinion is based largely on the application of his knowledge, training, and experience to the underlying data, the analytical gap analysis rather than the *Robinson* factors applies. *Id.*

---

[9] The *Camacho* court stated that the proper review under the facts in that case would include the *Robinson* factors and the analytical gap test. *Id.* at 640.

Affirming the trial court's admission of the expert testimony in that case, the appellate court noted that the trial court could reasonably have concluded that the psychiatrist's "medical experience and knowledge, coupled with his testimony about the methodology he employed in reviewing the medical records, demonstrate the opinions he drew from the underlying medical records are reliable." *Id*.

We agree that, as in *In re Robinson*, the analytical gap approach was appropriate here, and are mindful that regardless of how reliability is measured, it is "incumbent upon an expert to connect the data relied on and his or her opinion and to show how it is valid support for the opinion reached." *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 819–20 (Tex. 2009).

### 4. Was Clayton's opinion reliable?

#### a. Clayton's Testimony

Clayton, a board certified psychiatrist, was given the testamentary capacity definition, and then opined that Tex lacked that capacity at every point in time after his stroke in 1997 until he died.[10] Clayton performed a forensic autopsy, which she described as a retrospective evaluation of competence. In forming her opinion, Clayton relied on deposition testimony, Tex's medical records, and a 2008 CT brain scan.

Clayton explained that "brain damage is permanent. The brain doesn't regenerate." Her opinions were based on reasonable medical probability, and she said, "this is all objective peer-reviewed research for when you have a stroke in that area."

Clayton also said that the CT scan showed brain damage that was not acute, meaning that it did not happen recently. The presence of scar tissue showed that the damage happened years before the scan. In her review of the CT scan, Clayton observed what she called a small "fist-

---

[10] Clayton's qualifications as a forensic psychologist are not at issue. Clayton further opined that Tex also lacked the capacity to contract and that he was susceptible to undue influence.

sized hole" in the subcortical area of the brain. She also said that the subcortical structure controls "executive functioning, working memory, and the ability to plan, solve problems, initiate." That part of the brain is also called the "speech center." Clayton noted that Tex developed asphasia, which is difficulty speaking, but would also have had difficulty understanding.

Clayton further explained that someone can lose executive functioning and still be able to sign his name, or have stimulus-based responses. But "as for anything more complicated where you've got to hold ideas, more than one idea in your head for a period of time, you don't have that ability."

Clayton was asked about the records and testimony of Dr. Carroll, Tex's treating physician from 2002-2010. She said the records showed that Tex had the ability to converse on a superficial level, but Carroll never did any formal testing to "understand the depth."

Additionally, Clayton testified that Carroll's records reflect that Tex forgot a discussion about diabetes, and also forgot what his pills were. Clayton thought that forgetting the diabetes diagnosis was significant because this is a serious condition that one does not typically forget.

The records also showed that Carroll's discussions were always with Tex and his caregiver, or the caregiver and Sallie. According to Clayton, this showed "on a practical basis, there was some, you know, issue that Tex couldn't receive information or communicate information and required someone else there."

Clayton denied ignoring or disregarding Carroll's records. To the contrary, she said that Carroll's records were consistent with her opinion because (i) he or the staff always discussed with Sallie or the caregiver what Tex was supposed to do even while Tex was in the room, (ii) the records mentioned Tex not remembering things, and (iii) there were references to Tex not being able to identify his medicines.

–16–

Clayton also reviewed Barnhill's testimony that Tex was able to conduct business and that his memory was okay. Clayton, however, said that the kinds of things Barnhill observed, like making decisions about the placement of decorative objects, were stimulus-based responses that "don't require higher executive functioning or processing of information or memory of more complex matters."

Likewise, according to Clayton, the testimony from people Tex saw socially that his memory seemed intact showed interaction on a superficial level.

Furthermore, Clayton watched the video of the June 1998 will execution and said that it did not persuade her that Tex was in control of his mental abilities. In fact, she thought it showed a lot of his deficits and "how he was being . . . directed and managed by other people." Clayton also said the video did not show Tex being asked what he was doing and what his intentions were in a way that would require an explanatory answer. Instead, the questions elicited only "yes" or "no" responses.

Clayton added that short-term memory is always the first to go. On the other hand, she said long-term memory, "such as where you were born, where you graduated school" is "one of the last things to go." Consequently, according to her, people can be fooled about someone's abilities when that person demonstrates long-term memory and that Tex's ability to speak foreign languages was consistent with having long-term memory.

Moreover, Clayton testified that testimony that Tex could "fake it" with people would be consistent with her opinion, as would be testimony that Tex could forget within a day what he had done. In Clayton's opinion, Tex had fooled the lawyers who prepared his wills about his testamentary capacity. He also fooled the trust officers, Dr. Carroll, and his housekeeper.

Clayton also reviewed and was asked about the examination notes of Dr. John Hart, the neurologist who ordered Tex's CT scan. Clayton said that Hart "did the objective testing and

was correct in his diagnoses [of the stroke]." She disagreed, however, with his characterization of the size of the stroke area and Tex's prospects for improvement. And Clayton said that Hart's note stating "[d]oes not reflect [Tex's] condition" is unclear, and she does not know what Hart meant. Hart did not testify at trial.

### b. Appellant's Reliability Arguments

Appellants insist that Clayton's opinion is not reliable because she failed to explain her conclusion that Tex lacked testamentary capacity. Expert testimony is conclusory if there is no factual basis for it, or if the basis offered does not, on its face, support the opinion. *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 202 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We disagree with appellants.

Clayton testified that the CT scan shows that Tex lacked capacity because (i) the scan shows damage to the brain's subcortical structure causing a lack of executive functioning, (ii) the damage is permanent, and (iii) the stroke caused damage would never change. Thus, Clayton explained how and why she reached her conclusion. She also testified that her conclusion is based on reasonable medical probability and objective peer-reviewed research concerning what occurs after a stroke in that area of the brain.

Appellants, however, assert several reasons why Tex's medical records are not a reliable foundation because they do not actually support Clayton's opinion:

One, appellants argue that while Clayton characterized the area of brain damage as that of a small "fist-sized hole," the records describe the lesion as "small." This descriptive distinction, however, does not render the underlying opinion unreliable since both sides had the opportunity to address this point and appellants did not adduce any conclusive or overwhelming contrary evidence. None of appellants' witnesses testified about the CT scan and there was no

–18–

controverting expert testimony about it. And Clayton later explained that she meant a small fists such as her own hand.

Two, appellants assert that the CT Scan was performed eleven years after the stroke. But there was no evidence of an additional stroke between the 1997 stroke and the 2008 CT scan, and Clayton explained that the brain does not regenerate itself. Appellants did not produce any controverting evidence on that point. Three, appellants complain that Clayton did not know what Hart meant in one of his notations. That fact, however, does not make her testimony unreliable. There was no testimony about what the notation meant, or that it was commonly understood to have a particular meaning.

Four, appellants claim that Clayton equated Tex's brain damage to dementia, and then criticize her because she allegedly admitted "her dementia opinion did not necessitate a finding of lack of capacity." Clayton's testimony was:

Q. You're not certain whether Tex had dementia or not, are you?

A. Well, if you're considering the dementia being the brain damage that he had from the 1997 stroke, yes.

Q. Has that always been your opinion, that you were sure he had dementia?

A. If you're considering the brain damage that he had from the 1997 stroke. I've always thought that he had brain damage from the 1997 stroke. It is more -- what we discussed in the deposition it is more a semantics of whether you want to call it dementia or damage from the stroke.

…

Q. And you would agree with me that even with moderate dementia, 50 percent of those people still have testamentary capacity, correct?

A. I would say that's an estimate, yes.

We disagree that this testimony establishes an inconsistency that renders Clayton's opinion inadmissible or inadequate to support the verdict. Clayton explained that referring to dementia or brain damage was a question of semantics. Her testimony that fifty per cent of

people with moderate dementia have testamentary capacity is general; it does not address her specific testimony that Tex lacked testamentary capacity.

Five, appellants argue that Clayton's reliance on medical record excerpts and Dr. Carroll's testimony make Clayton's opinion unreliable. We disagree. The issue is not whether Clayton's opinion was necessarily correct or disproved. *See Mack Trucks*, 206 S.W.3d 578 (evaluating whether expert testimony has been conclusively disproved by the opposing party does not equate to determining relevance and reliability). Instead, the inquiry is whether there is a gap between the facts (Tex's stroke and related medical and anecdotal evidence) and her ultimate conclusion (lack of testamentary capacity). Clayton's opinion bridged that gap.

Finally, Clayton's opinion was not limited to only the medical records and CT scan. It was also based on the observations of people who frequently interacted with Tex. As Clayton explained, consistent with what these people observed, Tex's loss of executive function did not prevent him from communicating on a superficial level and fooling people into thinking that he functioned at a higher level than he did.

From this evidence, the trial court could reasonably have concluded that Clayton's opinion was reliable and not conclusory. It was therefore not an abuse of discretion to admit her opinion into evidence, and we include her opinion in our assessment of the sufficiency of the evidence to support the jury's verdict.

### 5.      Other Evidence Probative of Testamentary Capacity

Having concluded that Dr. Clayton's opinion is probative of capacity and therefore properly included in our legal and factual sufficiency reviews, we now examine other evidence concerning Tex's testamentary capacity at the relevant times.

## Vale Asche Elkins

Vale Asche Elkins was Tex's youngest daughter, and by all accounts, was particularly special to him. Vale provided the following testimony:

Before the stroke, her father was a control freak, and handled everything in his relationship with Sallie. After the stroke, however, his entire personality changed Tex was confined to a wheelchair and could not drive. He needed help with eating, dressing, and bathing.

Tex was quiet and withdrawn, and did not initiate conversations. One had to be very concrete when communicating with Tex because he could not be abstract. Tex could nod his head to signify "yes" or "no" and act like he was part of the conversation, but many times he did not understand what was going on.

Although his long term memory was good, his short-term memory was not. In fact, he could not remember the name of his caretaker, Edsel, who was with him almost daily, or the names of his grandchildren. He frequently called Sallie by an ex-wife's name.

After the stroke, Vale took Tex to the movies and to lunch almost every week. She would give him a choice of movies and Tex would pick one. She kept her speech slow, concise, and simple because Tex did not have the ability to follow a long train of thought. Although she would talk to Tex about movie times, she would confirm the times with Edsel. On the few occasions when she did not do so, Tex directed Edsel to the wrong place. When they dined, Vale would remind Tex what he liked at particular restaurants and he would select from those options. Although Tex would sign the check, Vale would calculate the tip.

Additionally, she signed the various trust documents she was asked to sign throughout the years because she was asked to do so and trusted the trust officers. In her opinion, Tex did not have the ability to sign any of these documents and would sign anything put in front of him.

Finally, she had a great relationship with her father after the stroke, and that never changed. When asked about the 2005 appointment of Sallie and Sallie's two friends as Tex's guardian to the exclusion of Vale and her siblings, Vale said that her father would not have done that "in a million years."

### Ed Elkins

Ed Elkins, Vale's husband, testified that he and Vale saw Tex and Sallie about once a week before the stroke and six to seven days a week for the first four to five months after the stroke. According to Ed, the statement in the Reid Memo that Tex was partially motivated to make a new will because his children had not paid much attention to him after the stroke was not true.

Ed also said he thinks (i) Reid was kind of "in cahoots" with Sallie in 1998 because all communications were with Sallie and (ii) Tex would not have put the mental effort into preparing a new will while he was trying to recover from a stroke since he had a will already in place that "he probably felt good about."

Ed further said that Tex did not have the capacity to understand the 2005 will or the ability or patience to read the forty-one page, single-spaced document. Likewise, according to Ed, Tex did not have the ability to understand the codicils.

Ed also testified that Tex would never have removed Vale as a trust beneficiary as he did in 2011. Vale and her father were very close.

### Craig Asche

Craig Asche is one of Tex's sons. He testified that:

After Tex's stroke: (i) one could not have a conversation of any substance with him, (ii) conversations were one-way and one had to lead Tex to a one or two word response and (iii) Tex was unable to plan anything and had shifting attention.

He did not think that after the stroke his father was competent to execute wills do trust modifications, or understand the trusts' powers of appointment. He had no idea why his father would have prepared two wills and two codicils in the nine months following his stroke. And he did not think it was appropriate for Tex to sign wills and codicils after his stroke because these were significant legal documents that he did not have the capacity to understand.

He had a very strong relationship with his father in 1998 and could think of no reason why Tex would want to take him out of his will. Tex was the closest to Vale and would never have taken her out of his will. Craig could only suspect that Sallie did so because she was upset with Vale for some reason.

After Tex died, Craig prepared an email to one of Tex's Amherst College classmates in which he wrote that Tex had a sharp mind and could manage his affairs until the day he died, he did not believe that was true. He wrote it that way to honor his father's memory and because to do otherwise would have hurt Sallie.

Even though he did not think Tex had the capacity to sign legal documents after the stroke, he was comfortable with Tex signing documents the trust officers asked Tex to sign because he (Craig) had full faith in them and believed they were looking out for the family's interests.

He did not know that Sallie purchased a multi-million dollar condo in New York until after she died because Sallie kept the purchase a secret from everyone. And he added that Tex's purported signature on the request to transfer $3,700,000 from their joint account for the purchase was a forgery and everyone believed that it was Sallie who forged the signature.

According to Craig, Tex would certainly have noticed a $3,700,000 transfer from his account before the stroke. But it was certainly possible that he could have missed it after the stroke.[11]

The mineral trust historically provided the largest distributions to the Asche family, but Craig and Sallie had a conversation in which she said she wanted the distributions increased. The Children testified, however, that they were concerned that these increased distributions would deplete the trust.

In 2005, Tehan (the attorney who prepared the 2005 will) asked the accountant to distribute an additional $1,600,000 annually for debt retirement, $285,000 for the use of a private plane, and $300,000 for a family vacation although Tex was already receiving $2,000,000 a year from that trust at the time and the additional requested distributions would have added even more. And there never was a family vacation after the stroke, nor was there any discussion of one. In fact, Craig did not learn of these additional requested expenditures until after this lawsuit was filed. Finally, Craig said that Sallie kept asking the trust officers to make transfers from Tex's trust accounts. When they asked for a power of attorney from Tex, she became angry and pulled the accounts from that institution.

### Vivian Asche

Craig's wife, Vivian, testified that Tex ran the show and cared for Sallie before the stroke. But after the stroke Tex was like her child, did not initiate conversations, and did not seem to follow anything that was complicated. When Vivian remarked to Sallie that Tex was relatively cheerful after the stroke, Sallie replied, "That's the power of meds." According to Vivian, Tex had no idea what pills he was taking, and Sallie would just "pop in" an antidepressant with all of his other meds. Vivian also said that she developed a close relationship with Sallie and they took three "girls" trips together. Yet Sallie never told her about

---

[11] Tex's financial advisor also testified that Tex would have noticed the missing $3,700,000 if he had capacity.

the New York condo, which surprised her because they were close. According to Vivian, after Tex's stroke, Sallie had mood swings, and would become angry about Aunt Vale (who controlled one of Tex's trusts) and one of the trustees.

### Mary Susan Barnhill

Barnhill was Sallie's friend and interior decorator, and she is the executrix of Sallie's estate. She testified that she knew about Sallie buying the New York condo and helped her keep it a secret. In fact, Sallie had the condo's account statements and tax bills sent to Barnhill's address. These statements included what Barnhill referred to as "the big account," which is the account from which Sallie took the funds to buy the New York condo. Barnhill also testified that she does not think Tex was competent from 2010-2011, but she believed he was competent before then. Furthermore, she said that Tex was actively involved in the architectural planning and decorating of his Dallas home after the stroke. Barnhill added that after the stroke Tex attended a gala event and placed a bid on a wine he remembered having enjoyed before the stroke, and that he spoke German with the Florida housekeeper and French with one of the investment bankers.

### Dan Jackson

Dan Jackson initially worked as a physical therapist for Tex when he was in rehabilitation after the stroke. Sallie later called him to work for Tex at their home. Dan was with Tex from about a year after the stroke until his death. Dan testified that:

Tex could not remember Dan's name, Sallie's name, or the name of his other caregiver, Edsel.

Dan never saw Tex conduct any business. Although Tex would receive mail and financial statements on his desk, he did not think Tex understood the financial statements. Later, Tex only got newspapers and magazines on his desk, and he (Dan) would get the mail and take it

–25–

to Sallie, who ran the house "from top down." Sallie would leave a pile of newspapers and magazines for Tex, but he would just flip through them.

Sallie would bring Tex a document to sign, and if Tex asked what it was, she would tell him "what we talked about with the lawyer or accountant." But if they had been at the lawyer's office the day before, or even five hours before, Tex did not have the ability to remember what was talked about. If it was an hour ago, "possibly." But if alcohol was involved at any time during that period of time, "definitely not."

Tex could mask his mental deficits. If someone interacted with Tex on a superficial level, it was okay, but not if the interaction was in depth. He anticipated long ago that he would be called to testify because at some point when Tex was alive, possibly in 2004, he recalled Sallie "flying in through the garage," angry, stating, "Those [f–ing] kids are never going to see a penny of this money."

Tex knew he had a lot of money but did not understand the specifics. Following the stroke, Tex could not put a lot of facts together and make a decision about them. Tex "didn't have all of his judgment," and they had to monitor Tex's phone calls out of concern for telemarketers taking advantage of him.

Tex could do a one-step command, but not a three-step command. If you told Tex to take staples off of a table and take them to that guy over there, and take this pen over to that guy, Tex would be lost.

Although Dan witnessed one of the codicils to the 2005 will, he does not believe Tex was competent at that time. Dan did not recall where the documents were signed, but does not believe it was in a lawyer's office. When he was asked about testimony to the effect that Tex was persistent and got what he wanted, Dan explained, "We're talking about the bottom rung of Maslow's hierarchy: food, water, drink, whatever."

### Cindy Asche

Cindy Asche, a nurse, is married to Tex's son Fritz. She married Fritz in 1997, the year of Tex's stroke. She and Fritz saw Tex and Sallie about four to eight times per month after the stroke. Cindy developed a close relationship with Sallie and loved her. But Sallie suffered periods of depression and could fly into a rage against whomever was around at the time. Sallie would get furious at the trust officers.

At some point, Barnhill said that she and Sallie went over the trust documents so that Sallie could get control. According to Cindy, Sallie seemed knowledgeable about the trust and handled all of the business after the stoke. She never saw Tex conduct business following the stroke and did not believe he could do so. Tex's judgment was significantly impaired after the stroke. Sallie got him a motorized wheelchair, but Tex could not use it because he could not judge distances or go around corners and got frustrated.

Tex appeared to love Vale the most of all of his children and never expressed any anger at Vale. In September 2011, when Vale was removed as a beneficiary of certain trust income, Sallie was the only person who was mad at Vale. According to Cindy, Tex would never have done this.

At one point, Cindy told Craig that they were not getting very much money from the trusts. So Craig asked Sallie how the trusts were going to work, and Sallie became furious. She (Cindy) did not ask Tex directly because he did not know and would not have been able to tell her about any of his business.

Cindy also said that Tex's memory was not good. For example, a few hours after going to the movies, he would not remember what he saw. And she said that, after his stroke, Tex could not make a conscious decision about his will and trusts. When asked about the videotape of the June 1998 will execution, Cindy said Tex did not have the capacity to understand what he

had, and the video was designed to give the appearance that he knew what he was doing. But, in her opinion, he did not. After Tex died, Cindy had a conversation with Barnhill, who said Tex was not competent, and "we all knew it."

### Fritz Asche

Tex's youngest son Fritz testified that:

Although his father would have wanted to take care of Sallie during her lifetime, Tex also would have wanted the family money to stay in the family because the Asche family legacy was very important to Tex and he would not have wanted it to die out. "In his right mind," according to Fritz, Tex would never have directed money out of the family.

Tex's personality changed dramatically post-stroke. He was no longer a commanding figure, and he was very reserved. He could not start conversations or discuss current events. Fritz never saw Tex handle business affairs, write checks, or pay bills after the stroke. He does not believe Tex was capable of executing a will or a codicil after the stroke.

### Sharon Johnson

Sharon Johnson was Tex's neighbor. She testified that Tex's memory following the stroke was not good and he would not remember what had been said five minutes earlier. She also said Vale was the "apple of [Tex's] eye," and he would never have disqualified her from being his guardian.

6.     **Contrary Evidence**

Appellants urge that none of this testimony addressed the pivotal question—whether Tex had testamentary capacity on the days when he executed the contested estate planning documents. To this end, appellants underscore that all of Tex's lawyers saw Tex at the time of execution and all said he had testamentary capacity.

**Reid**

According to a memo Reid prepared his impressions of Tex when the January 1998 will was executed:

Tex was partially paralyzed on his right side and had some trouble speaking when he met with Tex and Sallie in their home to discuss their estate planning. But, "[Tex] was understandable and clearly understood what was said to him[,]" took the lead in the conversation, and "made it clear that the matters discussed were the results of his decisions."

Reid and Tex discussed tax treatment of certain options, the use of a marital trust, choice of executor, contingencies, and exercise of the powers of appointment. Tex wanted to change his will because his children had paid little attention to him after his stroke but made it clear that his children have substantial property and would receive even more after his death.

After the meeting, Reid prepared a new will for Tex. Tex called him after he received that new will and said that upon reflection, he did not want to utilize a reverse Q-Tip trust, but instead wanted to leave the entire residue of his estate to Sallie. Reid revised the will and mailed it to Tex.

Four days later, Reid met with Tex and Sallie in their home. Reid asked to meet with Tex alone and told him about the operative will provisions. Tex insisted that he had carefully read each page of the entire will. Reid then asked the witnesses to return to the room, and Tex initialed every page and signed the will. Reid said that Tex was "perfectly rational throughout [the meeting] and clearly understood that he was executing a new will and was doing so of his own free will."

Reid concluded by stating, "In my opinion, [Tex] was competent. He was alert and all of his responses were appropriate. He gave no indication of being subject to any undue influence."

## Godwin and Vetter

Similarly, Godwin testified that he and Tex had "normal" attorney-client discussions, and based on Tex's responses to his questions, concluded that Tex understood the major provisions pointed out to him. Godwin and Vetter both concluded that Tex was competent to execute the wills and codicils.

## Dr. Carroll

Appellants further rely on Dr. Carroll, who testified that he saw Tex more than fifty times from 2002-2010, and concluded Tex was alert, oriented, and exhibited no signs of dementia or cognitive impairment.

### Other Evidence

Appellants identify other evidence indicating that Tex had the requisite testamentary capacity at the relevant dates. For example, the Children never raised any questions about Tex's capacity to sign important documents during his lifetime, Tex could still converse in foreign languages, he seemed able to understand and discuss financial matters, and he gave advice to friends about buying homes and cars.

### 7. Conclusion

There is unquestionably conflicting evidence regarding Tex's testamentary capacity at the relevant points in time. But the contrary evidence upon which appellants rely is part of the mix the jury considered when determining witness credibility in its ultimate testamentary capacity determination. *See In re Estate of Robinson,* 140 S.W.3d at 793 (capacity determined by the jury). We may not substitute our judgment for the jury's. *City of Keller,* 168 S.W.3d at 822. And the jury's resolution of any conflicts and inconsistencies in the evidence against appellants does not render the evidence insufficient. *See Barnhart v. Morales*, 459 S.W.3d 733, 747 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (addressing factual sufficiency of the evidence).

Having reviewed all of the evidence, we conclude first that considering only the admitted evidence favoring the jury's lack of capacity finding—including Dr. Clayton's testimony regarding the stroke's persistent effect on Tex's executive functioning and lay testimony consistent with Clayton's testimony—there is more than a scintilla of evidence from which a rational jury could reasonably have found that Tex lacked capacity to execute the 1998 will and all subsequent wills and codicils.

Furthermore, considering all of the above evidence, including all of the evidence favoring appellants, we conclude that the jury's lack of capacity finding is not against the great weight of the evidence. *See In re Estate of Hemsley*, 460 S.W.3d 629, 635 (Tex. App.—El Paso 2015, pet. denied) ("In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review.").

We thus resolve appellant's first, second, third, and fourth issues against them. In light of this conclusion, we need not also consider whether Tex was unduly influenced.

**B.    Issue Five:    Did the trial court erroneously exclude evidence?**

Appellants attempted to admit Sallie's final estate planning document into evidence. The document showed that she left her estate to Baylor "for the purpose of providing financial assistance to those persons who need a bone marrow or other blood related transplant and who cannot otherwise pay for such transplant." The trial court found the evidence was relevant, but conducted a rule 403 balancing test and concluded that the danger of unfair prejudice outweighed the evidence's probative value. Specifically, the court ruled that appellants could elicit testimony that Sallie left her estate to Baylor for charitable purposes, but could not specifically tell them it was for indigent cancer patients needing bone marrow transplants. Appellants now argue that this evidence was erroneously excluded.

### 1. Standard of Review and Applicable Law

We review a trial court's evidentiary rulings under an abuse of discretion standard. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). An abuse of discretion occurs when the trial court acts in an unreasonable and arbitrary manner, or when it acts without reference to guiding rules or principles. *Gunn v. Fuqua,* 397 S.W.3d 358, 377 (Tex. App.—Dallas 2013, pet. denied). "When reviewing matters committed to the trial court's discretion, we may not set aside the trial court's ruling unless it is clear from the record that the trial court could reach only one decision." *McKinney Ave. Properties No. 2, Ltd. v. Branch Bank & Trust Co*., No. 05–14–00206–CV, 2015 WL 3549877, at *3 (Tex. App.—Dallas June 5, 2014, no pet.) (mem. op.). In addition, the exclusion of evidence only requires reversal if the error probably caused the rendition of an improper judgment. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

Generally, relevant evidence is admissible. *See* TEX. R. EVID. 402. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. But evidence that is otherwise admissible may still be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403.

### 2. Was the ruling outside the zone of reasonable disagreement?

Appellants contend that excluding evidence of Sallie's particular testamentary disposition was an abuse of discretion because it misled the jury regarding her character. Specifically, they argue that the jury was deprived of evidence concerning her kindness and this evidence was necessary to controvert the Children's adverse evidence of her character. They claim it also deprived the jury of knowing that Baylor intervened in the lawsuit to protect the indigent.

–32–

We disagree that the jury was misled or that the trial court abused its discretion by excluding the precise way Sallie wanted the money to be used. Baylor was allowed to tell the jury that it was a beneficiary of Sallie's estate. And the jury also learned that Sallie's prior estate planning document gave the residue of her estate to a medical facility in Dallas for patients who have had strokes and spinal cord injuries. Thus, the jury was told that Sallie's estate was left for charitable purposes. We therefore conclude the trial judge did not abuse his discretion by excluding evidence of the precise charitable purpose of the bequest.

Likewise, the jury was not misled about Sallie's character. There was considerable evidence concerning positive character traits, including the Children's testimony that they loved Sallie, and she was good and caring and brought the family together. Sallie's friends confirmed these observations. That she left her estate to charity underscores this fact, and the trial court could reasonably have concluded as it did.

Under these circumstances, we cannot conclude that the trial court's decision was outside the zone of reasonable disagreement and need not address this issue's harm element. We thus resolve appellants' fifth issue against them.

**C.** **Issue Six:** **Was there jury misconduct requiring a new trial?**

During trial, an attorney representing the Children was investigating the jury and accidentally sent a juror named Pollard an invitation to connect through the LinkedIn business networking site. The Children's counsel promptly brought the matter to the court's attention, told the court he was not sure the juror had received the invitation, and suggested there were alternate jurors or the court could give the jury an instruction that the contact was accidental.

Appellants' counsel responded:

I don't want the solution to be worse than the problem. We're not going to let the juror go, that's not the appropriate thing. I'm worried the instruction will create worse of a problem than where we are. We don't know if there was any actual contact, but I certainly appreciate Counsel calling it to everybody's attention. But

–33–

I don't want to create a solution with an instruction that in any way impugns anybody, but that makes the problem worse. So I would say if we don't hear anything from the juror, we just let it go.

The trial judge decided to generally remind the jurors of their duty to report inappropriate contact.

The juror did not report the contact, and on the day the verdict was returned, but before the judgment was entered, accepted the invitation. This acceptance did not come to light until after the trial had concluded. Appellants then moved for a new trial based on juror misconduct and attached post-trial deposition testimony from Pollard and two of the Children's lawyers. Reviewing only the motion and deposition testimony, the court concluded that appellants failed to present evidence tending to establish a cognizable claim of jury misconduct. Accordingly, the court denied the motion without conducting a hearing.

Appellants' sixth issue asserts that this alleged misconduct requires a new trial.

### 1.      Standard of Review and Applicable Law

We review a trial court's denial of a motion for new trial based on jury misconduct under an abuse of discretion standard. *See, e.g., Hutton v. AER Mfg. II, Inc.*, 224 S.W.3d 459, 463 (Tex. App.—Dallas 2007, pet. denied). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

To obtain a new trial based on jury misconduct, the movant must establish that (i) misconduct occurred, (ii) it was material, and (iii) it probably caused injury. TEX. R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000); *Holland v. Loveless*, 352 S.W.3d 777, 783 (Tex. App.—Dallas 2011, pet. denied). The complaining party has the burden to prove all three elements. *Redinger v. Living, Inc.*, 689 S.W.2d 415,419 (Tex. 1995).

Rule of civil procedure 327 imposes a duty on the trial court to receive evidence of juror misconduct if it is properly presented by affidavits or an equivalent explanation. *See In re Zimmer*, 451 S.W.3d 893, 901 (Tex. App.—Dallas, 2014, no pet.). The trial court must make an initial determination concerning material misconduct based on the motion and the attachments. *Id.* Before a party is entitled to a hearing on a motion for new trial alleging juror misconduct, he must first afford assurance to the court that he will probably be able to prove the motions' allegations. *See Elston v. Sherman Coca-Cola & Dr. Pepper* Co., 596 S.W.2d 215, 217 (Tex. Civ. App. —Texarkana 1980, no writ).

Moreover, a trial court may properly deny a motion for new trial when a party alleging jury misconduct relies only on affidavits and fails to request a hearing on his motion and offer live testimony proving misconduct. *Zimmer*, 451 S.W.3d at 902.

### 2. Did appellants meet the burden for a new trial?

Appellants note that "the trial court denied the motion without conducting a hearing, but . . . considered all of Appellants' evidence in deciding the motion." The record, however, does not reflect that appellants requested a hearing or the opportunity to present live testimony to meet their burden. Thus, there is no competent record evidence showing that the trial court abused its discretion by denying a new trial. *See id.*

Appellants nonetheless contend that the contact here involves the kind of "special favor" present in *Texas. Employers. Insurance. Association v. McCaslin*, 317 S.W.2d 916, 921 (Tex. 1958). Consequently, appellants maintain that the communication itself is sufficient to show materiality and probable injury. *Id.*

There is no question but that the contact, albeit inadvertent, was misconduct because it violated the court's admonitory instructions concerning contact between lawyers and jurors. *See Sharpless v. Sim*, 209 S.W.3d 825, 828 (Tex. App.—Dallas 2006, pet. denied). However, we

disagree that the misconduct here is "so highly prejudicial and inimical to fairness" as to trigger a *McCaslin* presumption. *See McCaslin*, 317 S.W.2d at 921. As the supreme court has held, "special favor" cases are qualitatively different from those involving limited, innocuous contact with a juror. *See In re Health Care Unlimited, Inc.*, 429 S.W.3d 600, 603–04 (Tex. 2014) (orig. proceeding).

In *McCaslin*, the plaintiff asked a juror to "be sure you do all you can to help me," and the court concluded that injury occurred as a matter of law. *McCaslin*, 317 S.W.2d at 918. In reaching this conclusion, the court noted that the record clearly indicated that the contact's purpose was to influence the juror's actions in the case. *Id*. at 921.

Other courts have reached similar conclusions when there are "special favors" involved. *See Tex. Employers Ins. Ass'n v. Brooks*, 414 S.W.2d 945, 945–46 (Tex. Civ. App.—Beaumont 1967, no writ) (driving juror home to another city); *Milk Products Co. v. Birtcher*, 157 S.W.2d 633, 635 (Tex. 1941) (buying juror a coke); *Occidental Life Ins. Co. v. Duncan*, 404 S.W.2d 52, 53 (Tex. Civ. App.—San Antonio 1955, writ ref'd n.r.e.) (plaintiff suing for a disability asked a juror for an aspirin). Moreover, something more than accidental contact is required before a court must grant a new trial. *See, e.g., GTE Comm. Syst. Corp. v. Telecom Comm*., No. 05-96-00430-CV, 1998 WL 548763, at * 11 (Tex. App.—Dallas Aug. 31, 1998, pet. denied) (helping jurors whose keys were locked in a running car); *Keene Corp. v. Yeager*, No. 05-91-01903-CV, 1994 WL 34159, at * 13–14 (Tex. App.—Dallas Feb. 4, 1994, pet. denied) (hailing cabs for jurors).

Here, there is no evidence that the contact's purpose was to influence the juror. Rather, counsel said that the contact was accidental, and nothing in the record establishes otherwise. We therefore consider whether appellants proved materiality and probable injury.

"Misconduct is material when it is reasonable calculated to prejudice the rights of the complaining party." *Sharpless*, 209 S.W.3d at 829. There is no such evidence here. Indeed, it was the Children's counsel who expressed concern that the contact might prejudice them, rather than injure appellants.

Likewise, there is also no evidence that the juror was influenced. The juror testified that he thought the connection would be helpful in his future business, and appellants contend that the verdict could not have been rendered without the juror's vote in the 5-1 majority. To show probable injury, however, there must be an indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would have done otherwise on one or more issues vital to the judgment. *Pharo v. Chambers Cnty.*, 922 S.W.2d 945, 950 (Tex. 1996). There is no probable injury when the jury probably would have rendered the same verdict even had the misconduct not occurred. *Sharpless*, 209 S.W.3d at 828. Here, because there was no hearing and thus no evidence, there is no evidentiary nexus between the juror's general perception about the contact and the juror's vote.

Finally, we note that while appellants' reaction to the misconduct at trial does not constitute waiver of the right to complain about the issue, it is a factor that is pertinent to whether there was injury. When the Children's counsel disclosed the improper contact, appellants asked the court to take no action. The only thing that changed after the jury returned a verdict against them was confirmation of the fact that the juror had received the communication.

For these reasons, we conclude that appellants failed to prove the trial court abused its discretion by not granting them a new trial. We thus resolve their sixth issue against them.

**D. Issue Seven: Did the trial court have jurisdiction to set aside the management trust?**

The trial court's judgment invalidated Tex's 2005 management trust. Appellant's seventh issue asserts that the trial court lacked jurisdiction to do so because that trust's trustee was not joined as a party. We agree.

### 1. Standard of Review and Applicable Law

Subject matter jurisdiction may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). We review a challenge to a trial court's subject matter jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 228 (Tex. 2004).

For a trial court to have jurisdiction over a party, the party must be properly before the court in the pending controversy as authorized by procedural statutes and rules. *In re Mask*, 198 S.W.3d 231, 234 (Tex. App.—San Antonio 2006, orig. proceeding). "In no case shall judgment be rendered against any defendant unless upon service, or acceptance or waiver of process, or upon an appearance." *Mapco, Inc. v. Carter*, 817 S.W.2d 686, 687 (Tex. 1991) (citing TEX. R. CIV. P. 124). It is well established that suits against a trust must be brought against its legal representative, the trustee. *See Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex. 2006). Thus, for relief to be ordered "against a trust," its trustee must be properly before the trial court as a result of service, acceptance, or waiver of process, or an appearance.[12] *In re Ashton*, 266 S.W.3d 602, 604 (Tex. App.—Dallas 2008, orig. proceeding).

### 2. Failure to join the trustee

TCB, the management trust's trustee, was named and appeared in its capacity of executor of Tex's estate but not as trustee of the management trust. Executor and trustee are separate and

---

[12] Trusts are not legal entities; rather, they refer to the fiduciary relationship that a trustee holding legal title to property owes to the beneficiaries for whom the trustee holds that title. *See Huie v. DeShazo*, 922 S.W.2d 920, 925-26 (Tex. 1996).

distinct capacities.  Therefore, failure to join the trustee of the trust was fatal to jurisdiction over that trust, and the court had no authority to set aside the trust.  Appellants' seventh issue is sustained.

### III.   Conclusion

We sustain appellants' seventh issue and resolve all other issues against them.  We reverse the trial court's judgment setting aside the 2005 management trust, and affirm the remainder of the judgment.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

150102F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

TEXAS CAPITAL BANK, AS
SUCCESSOR INDEPENDENT
EXECUTOR OF THE ESTATE OF
FREDERIC B. "TEX" ASCHE, JR.; MARY
SUSAN BARNHILL, AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF
SARAH P. "SALLIE" ASCHE; AND
BAYLOR UNIVERSITY MEDICAL
CENTER, Appellant

On Appeal from the Probate Court No. 2,
Dallas County, Texas
Trial Court Cause No. PR-11-3533-2.
Opinion delivered by Justice Whitehill.
Justices Bridges and Francis participating.

No. 05-15-00102-CV     V.

FRITZ ASCHE, VALE ASCHE ELKINS,
CRAIG ASCHE, LISA MITTNACHT,
AND RICK ASCHE, Appellee

In accordance with this Court's opinion of this date, the portion of the trial court's judgment setting aside the 2005 management trust is **REVERSED** and the remainder of the judgment is **AFFIRMED**.

It is **ORDERED** that appellee FRITZ ASCHE, VALE ASCHE ELKINS, CRAIG ASCHE, LISA MITTNACHT, AND RICK ASCHE recover their costs of this appeal from appellants TEXAS CAPITAL BANK, AS SUCCESSOR INDEPENDENT EXECUTOR OF THE ESTATE OF FREDERIC B. "TEX" ASCHE, JR.; MARY SUSAN BARNHILL, AS INDEPENDENT EXECUTRIX OF THE ESTATE OF SARAH P. "SALLIE" ASCHE; AND BAYLOR UNIVERSITY MEDICAL CENTER.

Judgment entered February 17, 2017.